DAVID FLOOD *vs.* SOUTHLAND CORPORATION & another.[1]

No. 91-P-440.

Middlesex. June 8, 1992. - September 15, 1992.

Present: WARNER, C.J., GILLERMAN, & IRELAND, JJ.

Further appellate review granted, 413 Mass. 1109 (1992).

*Evidence*, Guilty plea, Admissions and confessions. *Negligence*, Comparative, Intentional conduct, Proximate cause, Foreseeability of harm, Duty to prevent harm, Retailer. *Proximate Cause. Practice, Civil*, Parties, Instructions to jury, Question by jury. *Damages*, Apportionment.

At the trial of negligence claims against the corporate owner of a convenience store (the store) and an individual who admitted stabbing the plaintiff while on the store's premises, the judge erred in excluding the store's proffered evidence that, in connection with the incident, the individual defendant had pleaded guilty to charges of armed assault with intent to murder and assault and battery by means of a dangerous weapon, where the guilty plea admissions were inconsistent with that defendant's trial position that the stabbing had been negligent, and where the admissions were probative on the jury issues whether the stabbing was an intervening, intentional, unforeseeable act, which would have exculpated the store entirely, or, alternatively, whether it was an intentional act, which would have removed the individual defendant from the jury's assessment of comparative negligence. [293-296]

At the trial of negligence claims against the corporate owner of a convenience store (the store) and an individual who admitted stabbing the plaintiff while on the store's premises, there was sufficient evidence from which the jury could conclude that the stabbing should have been foreseen and was preventable by the store. [296-299]

At a civil trial, the judge properly refused to allow impeachment of an expert witness by means of an affidavit he had given in connection with summary judgment proceedings in the case, where the judge could properly determine that the affidavit had no relevant inconsistency with the witness's trial testimony. [299]

At the trial of negligence claims against the corporate owner of a convenience store and an individual who admitted stabbing the plaintiff while on the store's premises, it was error not to allow the jury to determine whether the stabbing was intentional, a finding which, if made, would have eliminated the individual defendant from their assessment of comparative negligence. [299]

---

[1]John Darcy.

At the trial of negligence claims against the corporate owner of a conve-
nience store (the store) and an individual who admitted stabbing the
plaintiff on the store's premises, the judge should not have instructed
the jury that the store should be held to the standard of an "expert in
. . . providing security to its customers," rather than the standard of a
reasonable store owner in similar circumstances. [299-300]
In the context of instructions to the jury in a negligence case, the judge's
comment on the amount of potential recovery was not error. [300]
At the trial of negligence claims where the judge propounded special ques-
tions to the jury on the issue of comparative negligence, the judge
should have informed the jury, in response to their inquiry during delib-
erations, that the defendants' contributions to any damage award would
not be based on their relative degrees of fault as determined by the
jury, but, rather, would be determined under rules of joint and several
liability. [300-302]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 31, 1980.

The case was tried before *Katherine Liacos Izzo*, J., and
posttrial motions were heard by her.

*Thomas D. Burns* (*John J. McGivney* with him) for
Southland Corporation.

*Edward M. Swartz* (*Alan L. Cantor* with him) for the
plaintiff.

WARNER, C.J. Shortly after midnight on August 31, 1979,
the plaintiff, David Flood, then sixteen years old, was
stabbed in the heart by his friend, the defendant John Darcy,
then seventeen years old, outside a 7-Eleven store in Wake-
field owned and operated by the defendant Southland Corpo-
ration (Southland). As a result of his injuries, Flood is le-
gally blind, confined to a wheelchair, permanently and totally
disabled and dependent on custodial care for the rest of his
life; at the time of trial, his life expectancy was forty-seven
years.

1. *The incident.* On the night of August 30, 1979, Flood
and Darcy attended a party where they drank substantial
quantities of beer, and Darcy smoked marijuana. Flood and
Darcy usually carried knives, as did most of the youths with
whom they associated. At the party, Darcy carried a buck
knife in a sheath attached to his belt; he left the knife at the
party. Later, around midnight, Darcy met Flood and two

other friends on the street, and the four proceeded to the 7-Eleven store, a frequent gathering place for them and other youths in the neighborhood.

There was one person on duty in the store, Thomas Conomackos, the night manager. As the four boys entered the store, Conomackos thought they were "high" on alcohol or drugs. They fanned out, and he suspected they might be trying to steal something. Darcy purchased a sandwich, the others' made purchases, and all then went outside without incident. They remained on Southland's premises. A short time later, Darcy came back into the store and complained (cursing) to Conomackos about his sandwich and asked for his money back. Conomackos refused, since the sandwich was partially eaten, and told Darcy to leave the store, and Darcy did. Thereafter, Flood entered the store, told Conomackos that Darcy was upset and had a knife out and warned Conomackos to be careful. Conomackos told Flood to tell Darcy not to be stupid or to do anything foolish and assured Flood that he, Conomackos, could take care of himself. Flood left and went to where the youths had congregated outside the store, an area not visible from inside the store but on Southland's premises.

A short time later, Darcy and Flood began to scuffle. Flood showed the knife Darcy had left at the party, and Darcy wrested it from him. The two appeared to witnesses to be engaged in "horseplay." Then Flood, who was of larger build than Darcy, pinned Darcy against a wall with a forearm against Darcy's neck. Flood told Darcy that he was going to hit him, and Darcy responded, "You hit me and I'll stab you." Darcy repeated the statement, Flood paused and then lightly slapped Darcy on the face with an open hand. Darcy then stabbed Flood in the heart. Darcy testified that he did not believe that Flood was going to hit him, and he did not intend to stab Flood; Darcy did not know the knife was open; "I never even knew that I did it, except I knew it was done." About ten to twelve minutes after Flood had left the store, Conomackos was told of the stabbing. The police were called, and they arrived within five minutes.

2. *Some procedural background.* As a result of the stabbing, Darcy was indicted for assault and battery with a dangerous weapon (G. L. c. 265, § 15A) and armed assault with intent to murder (G. L. c. 265, § 18). He pleaded guilty to both charges and was sentenced to the Massachusetts Correctional Institution at Concord for ten years. On October 31, 1980, Flood commenced a civil action in the Superior Court against Darcy, claiming that Darcy's negligence caused his injuries. The complaint also contained counts against Darcy's parents for negligent supervision and, under G. L. c. 231, § 85G, for Darcy's "willful act in holding and using a knife in such a manner as to cause injury to David Flood."

Flood amended the complaint on December 2, 1981, adding counts in negligence against Southland and Federal Real Estate Trust, the owner and lessor of the property. The count against Federal Real Estate Trust was dismissed by summary judgment in August of 1984. On May 15, 1989, the parties filed a joint pretrial memorandum. Among the issues of fact and law which all parties agreed were to be determined at trial were whether (1) Flood, Darcy and Southland were negligent, (2) Flood's negligence was greater than the combined negligence of Darcy and Southland, (3) Darcy's acts were intentional, and (4) Flood's negligence was greater than any negligence of Southland.

The case proceeded to trial before a jury. On October 2, 1989, the first day of trial, Flood filed a second amended complaint, adding claims for nuisance against Southland, and dropping all claims against Darcy's parents, including the claim that Darcy's conduct had been "willful." Although Darcy had offered to settle, Flood's counsel told the judge that for tactical reasons, under the comparative negligence statute, he could not let Darcy out of the case. Southland opposed the amendment and argued that Flood was attempting to remove from the case the issue whether Darcy's conduct had been intentional. Darcy's counsel assured the judge that the issue of intentional tort, which he recognized as the

core of Southland's defense, would be litigated. The amendment was allowed.

Southland filed its answer to Flood's second amended complaint on October 6, 1989. In answer to Flood's claim of negligence against Darcy, Southland denied that Darcy's act was negligent and claimed that it was an intentional battery. Southland also made a cross claim for indemnity or contribution against Darcy based in part on the allegation that Flood's injuries "were caused in whole or in part by the intentional act of Darcy in committing a battery upon Flood." Darcy's counsel, who had admitted Darcy's negligence, opposed the addition of the cross claim on the grounds that until that point there had been no claim that Darcy's act was intentional (that was incorrect) and that the addition of the claim several days into the trial would require a change of trial strategy. Flood's counsel opposed the filing of the cross claim on the grounds that the addition of the cross claim was prejudicial and would change the nature and complexion of the case. From his point of strategy, as will be seen, that was correct. The judge refused to allow the cross claim to be filed.

On October 12, 1989, the case was submitted to the jury on special questions. See Mass.R.Civ.P. 49(a), 365 Mass. 812 (1974). Significantly, the jury were not asked to consider whether Darcy's conduct was intentional, apparently because the judge concluded there was no evidence that the stabbing was an intentional act and because she accepted Flood's and Darcy's arguments that battery was not an element of any party's case. The jury found that the negligence of each of the parties proximately caused Flood's injuries. Negligence was apportioned twenty-five percent to Flood, seventy percent to Darcy and five percent to Southland. The jury found for Southland on the nuisance count. Flood's damages were determined to be $1,763,000 (reduced to $1,322,250 on account of Flood's negligence). Statutory interest at the time of the judgment was $1,421,418.70.

Southland's motions for directed verdicts at the close of the plaintiff's case and after all of the evidence were denied,

as were its motions for judgment notwithstanding the verdict and for a new trial. Southland appealed from the judgment and the denial of its motions.

3. *The plaintiff's case against Southland.* The focus of the trial was on the issue of Southland's negligence. Flood claimed that Southland was negligent for failing to provide adequate security and failing to take adequate precautions to protect the safety of its patrons and customers. At the time of the incident, Southland was one of the largest twenty-four hour convenience store operators in the country. Flood introduced in evidence numerous internal documents of Southland concerning security and loss prevention due to robbery. Included in the robbery prevention material designed for employees was a directive that clerks "know what's happening outside the store."

Flood introduced the deposition testimony of Robert Quigley, Southland's northeast division loss prevention manager. Quigley said that it was Southland's standard to do everything possible to ensure the safety of all people who either worked or shopped at their 7-Eleven stores. Quigley testified that Southland was concerned about gang unruliness as well as robbery. He stated that from the point of view of safety it was important that the store clerk have a clear view outside the store.

Flood also introduced the testimony of a security expert, Paul Corbett. Corbett testified that the design of the Wakefield 7-Eleven was inadequate because there was a blind spot which blocked the clerk's view of activity outside the front of the store. It was Corbett's opinion that there was a "negligent situation" at the Wakefield 7-Eleven because the store personnel were not adequately trained in security and the store lacked security officers and security hardware such as closed-circuit television and direct alarm systems to a central station or the police. Corbett also testified that Conomackos should have called the police when he noticed that the boys were intoxicated and presented an inflammatory situation. He should have been aware of the activities outside the store,

and he should have called the police when he learned that Darcy had a knife.

Wakefield police reports were introduced showing that between January 1, 1978, and August 31, 1979, forty-two calls had been made requesting police assistance at or about the 7-Eleven store's premises for reasons including "kids causing trouble," "youths causing disturbance" and "youths fighting."

4. *The exclusion of evidence of Darcy's guilty pleas.* On the morning of the day the trial began, the judge allowed Flood's motion in limine to exclude evidence which might be offered by Southland with respect to Darcy's guilty pleas to criminal charges of armed assault with intent to murder and assault and battery with a dangerous weapon. Southland's counsel requested a contrary ruling before his cross-examination of Darcy. The judge affirmed the earlier ruling.

"A plea of 'guilty' is an admission of the material facts alleged in the complaint or indictment, . . . and in so far as it amounts to an admission of facts material in the trial of a civil case in which the person so pleading is a party, it is admissible as evidence against him. *Dzura* v. *Phillips*, 275 Mass. 283, 289, 290 [1931]. See *Blackman* v. *Coffin*, 300 Mass. 432, 437 [1938]. But such a plea, even when followed by a conviction, is not necessarily conclusive as to the facts admitted, and the record of a conviction based upon a plea of guilty is received 'not as a judicial act, having the force and effect of a judgment, but as a solemn confession of the very matter charged in the civil action.' *Mead* v. *Boston*, 3 Cush. 404, 407 [1849]. The plea may be explained and the reasons shown for entering it. *Buxton* v. *Somerset Potters' Works*, 121 Mass. 446 [,448 (1877)]. *Minasian* v. *Aetna Life Ins. Co.*, 295 Mass. 1, 3 [1936], and cases cited." *Aetna Cas. & Sur. Co.* v. *Niziolek*, 395 Mass. 737, 747 (1985), quoting from *Morrissey* v. *Powell*, 304 Mass. 268, 269 (1939). "The [criminal] defendant's guilty plea and any other admissions made during the plea-taking colloquy with the judge are admissible as evidence in the civil litigation." *Aetna Cas. & Sur. Co.*, 395 Mass. at 750.

On appeal, as in the Superior Court, Flood argues that the guilty plea admissions were not admissible in the trial because Darcy was not a "party opponent" to Southland; only Flood was, and the admissions were not made by him and cannot, therefore, be used against him. Darcy supported Flood's position. Southland's position was and is that the admissions are probative on the issue whether Darcy's act was intentional and thus whether, in the circumstances, it was an intervening act not foreseeable by Southland.

The rule allowing the use of admissions against a party is usually described as relating to "admissions of a party-opponent." "The statements made out of court by a party-opponent are universally deemed admissible, when offered against him." 4 Wigmore, Evidence § 1048, at 2 (Chadbourn rev. ed. 1972). See also Hughes, Evidence c. 27 (1961); Liacos, Massachusetts Evidence 276 (5th ed. 1981); McCormick, Evidence c. 25 (4th ed. 1992); Fed.R.Evid. 801(d)(2); Proposed Mass.R.Evid. 801(d)(2). At the heart of the theory of the admissibility and probity of the admission against a party, however, is the adverseness of the trial positions of the party offering the evidence and the party against whom it is offered. See *Genova* v. *Genova*, 28 Mass. App. Ct. 647, 652-653 (1990); *United States* v. *Palow*, 777 F.2d 52, 56 (1st Cir. 1985); *United States* v. *Horton*, 847 F.2d 313, 324 (6th Cir. 1988). "[W]hen offered *against* the party [, admissions] have . . . the same logical status as a *witness' self-contradiction.* Just as a witness' testimony is discredited when it appears that on another occasion he has made a statement inconsistent with that testimony . . . , so also the party-opponent is discredited when it appears that on some other occasion he has made a statement inconsistent with his present claim . . . . The witness speaks in court through his testimony only, and hence his testimony forms the sole basis upon which the inconsistency of his other statement is predicated. But the party-opponent, whether he himself takes the stand or not, speaks always through his pleadings and through the testimony of his witnesses put forward to support his pleadings; hence the basis upon which may be predicated a dis-

crediting inconsistency on his part includes the whole range of facts asserted in his pleadings and in the testimony relied on by him" (emphasis in original). Wigmore, *supra* § 1048, at 4.

Darcy's guilty pleas were inconsistent with his position at trial. In the argument on Flood's motion in limine, Darcy's counsel told the judge that he would admit in his opening statement to the jury that Darcy had been negligent. He did so,[2] and, in his answer to the second amended complaint, Darcy again admitted negligence. Darcy's trial position was also adverse to Southland. Darcy's counsel continued in his opening statement: "Was [Darcy] responsible for what happened? This case is not about Mr. Darcy's responsibility; it's about whether others should share in the responsibility for what happened. And I think, as you hear the evidence, as you heard the opening statements, you heard that that's the focus of what this case is about, whether Mr. Flood and whether the Southland Corporation shouldn't also share in the responsibility for what happened back in August of 1979."

Southland's trial position was adverse to Darcy's. Southland hoped to convince the jury that Darcy's act was an intervening, intentional, unforeseeable act, thus exculpating Southland entirely. Even if the jury did not accept this theory, see *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. 450, 452 (1969), if they found Darcy's act was intentional, that would remove Darcy from the jury's comparative negligence assessment and thus enhance the possibility that Flood's negligence when measured against Southland's would be found to have exceeded fifty percent (and thus preclude any recovery) or to have been significantly greater than the twenty-five percent found by the jury in a comparison with both defendants (and thus reduce any recovery). See G. L. c. 231, § 85; *Zeller* v. *Cantu*, 395 Mass. 76, 79 (1985); Nolan & Sartorio, Tort Law § 407, illustration 5 (2d ed. 1989). Intentional conduct cannot be negligent conduct, see *Waters*

---

[2]"Was Mr. Darcy negligent? Absolutely no question about it. None. We tell you that right here."

v. *Blackshear*, 412 Mass. 589, 590 (1992), and the comparative negligence statute, G. L. c. 231, § 85, does not allow for the comparison of negligent and intentional conduct. See *Sabatinelli* v. *Butler*, 363 Mass. 565, 567 (1973); *Lane* v. *Meserve*, 20 Mass. App. Ct. 659, 663 n.6 (1985); Schwartz, Comparative Negligence § 5.2, at 97 (2d ed. 1986). Cf. *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353-354 (1983).[3]

The fact that the admission of Darcy's guilty pleas might affect Flood's case does not provide a basis for their exclusion. Flood's refusal to settle the case against Darcy was acknowledged by Flood's counsel to be for tactical reasons. It is apparent that one of Flood's purposes in keeping Darcy as a party (and in not alleging intentional conduct and in resisting Southland's attempts to do so) was to avoid a situation in which the jury might compare only Flood's and Southland's negligence.

There was error requiring a new trial in the exclusion from evidence of Darcy's pleas of guilty to the criminal charges of armed assault with intent to murder and assault and battery with a dangerous weapon.

5. *Southland's motions for directed verdict and judgment notwithstanding the verdict.* On appeal, Southland argues only that the evidence was insufficient to support a jury finding that Darcy's stabbing of Flood was reasonably foreseeable or preventable. Southland acknowledges that it owed a duty of reasonable care to Flood, who was on its premises at the time of the incident. See *Glick* v. *Prince Italian Foods of Saugus, Inc.*, 25 Mass. App. Ct. 901 (1987). The jury's finding that Southland's negligence was a proximate cause of

---

[3]We do not discuss whether there was error in the judge's refusal to allow Southland to file a cross claim against Darcy which alleged intentional conduct and sought contribution or indemnification. The issue whether Darcy's conduct was intentional had been acknowledged by all parties to be in the case at least as early as the May 15, 1989, joint pretrial memorandum. During the argument on the second amended complaint, Darcy's counsel conceded that the issue was in the case: "I suppose that's the thrust of [Southland's] defense." Southland's answer to the second amended complaint alleged that Darcy's conduct was intentional. In the presentation of its case, Southland was entitled to raise the issue.

Flood's injuries must be upheld if, construing the evidence most favorably to Flood, "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972).[4] "The question of causation is generally one of fact for the jury. *Zezuski* v. *Jenny Mfg. Co.*, [363 Mass. 324,] 327 [1973]. [In a comparative negligence situation, a] plaintiff need only show 'that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible . . . . *McLaughlin* v. *Berstein*, 356 Mass. 219, 226 (1969). An expert's opinion based on facts in evidence is sufficient proof of causation. *Black* v. *Boston Consol. Gas Co.*, 325 Mass. 505 (1950). The plaintiff[ ] [is] not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that [the plaintiff] introduce[s] evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. Restatement (Second) of Torts § 433B, Comment b (1965).' " *Mullins* v. *Pine Manor College*, 389 Mass. 47, 58 (1983), quoting from *Carey* v. *General Motors Corp.*, 377 Mass. 736, 740 (1979).

The general rule is that " '[t]he act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury.' " *Jesionek* v. *Massachusetts Port Authy.*, 376 Mass. 101, 105 (1978), quoting from *Lane* v. *Atlantic Works*, 111 Mass. 136, 139-140 (1872).[5]

---

[4]The standard states the optimum. It does not follow, of course, that the jury could not have returned a finding in favor of Southland.

[5]"Cases . . . holding that a defendant, as matter of law, is not bound to anticipate the intervening acts of third parties have been largely confined to their facts." *Mullins* v. *Pine Manor College, supra* at 62 n.20.

There was sufficient evidence from which a jury could conclude that Darcy's stabbing of Flood should have been foreseen and was preventable by Southland. Southland knew or should have known of the numerous prior calls to the police on account of youth disturbances at or about the 7-Eleven store's premises. Conomackos, the night manager, knew that the four boys who entered the store and made purchases were "high," "a condition in which it is foreseeable that almost any irrational act is foreseeable," *Carey* v. *New Yorker of Worcester, Inc.*, 355 Mass. at 453, and were congregating in a blind spot outside the store. He also knew that Darcy was displaying a knife. The stabbing took place about ten to twelve minutes after Conomackos was told of the knife. The police were called and arrived within five minutes after the stabbing. Compare *Husband* v. *Dubose*, 26 Mass. App. Ct. 667, 672 n.3 (1988).

There was testimony from a loss prevention manager of Southland that Southland was concerned with gang unruliness and that employees should have a clear view outside the store. There was expert testimony that the 7-Eleven store was inadequately designed (blind spot), its employees lacked proper training in security, and it was without appropriate security devices, such as closed-circuit television and a direct alarm system, and security personnel. Cf. *Sharpe* v. *Peter Pan Bus Lines, Inc.*, 401 Mass. 788, 793-794 (1988). There was also expert testimony that Conomackos should have first called the police when he observed that the four boys were "high" and later when he was told by Flood that Darcy had a knife out.

Southland owed a duty to Flood "to use reasonable care to prevent injury to him by third persons whether their acts were accidental, negligent, or intentional." *Carey* v. *New Yorker of Worcester, Inc.*, *supra* at 452, citing Restatement (Second) of Torts § 344 (1964). It is not necessary that Southland have foreseen precisely the manner in which Flood's injuries were inflicted. See *Luz* v. *Stop & Shop, Inc. of Peabody*, 348 Mass. 198, 204 (1964). It is enough that Southland should have realized that there was preventable

real danger to its patrons. See *Carey* v. *New Yorker of Worcester, Inc., supra.*

6. *Restriction on cross-examination of Flood's security expert.* The judge refused to allow Southland's counsel to impeach the testimony of Flood's security expert, Paul Corbett, by the use of an affidavit prepared by Corbett for use in Flood's opposition to a successful motion for summary judgment by a former party to the action, Federal Real Estate Trust (Federal), the owner and lessor of the property. In the affidavit, Corbett stated that Southland and Federal were both negligent for failing to provide adequate security at the 7-Eleven store and that both parties' negligence was a proximate cause of Flood's injuries. There was no error. The judge could determine that Corbett's affidavit had no relevant inconsistency with his trial testimony. See *MacCuish* v. *Volkswagenwerk A.G.,* 22 Mass. App. Ct. 380, 391 (1986), *S.C.,* 400 Mass. 1003 (1987). Corbett's testimony that Southland was responsible for security did not logically imply that no other party had a like responsibility. Corbett did not testify, contrary to Southland's contention, that Southland "alone" was responsible for security.

7. *The failure to submit to the jury the question whether Darcy's conduct was intentional.* It was error not to allow the jury to determine whether Darcy's stabbing of Flood was intentional. The evidence, even without admission of the guilty pleas, was sufficient to permit a rational inference that Darcy acted intentionally. The jury should further have been instructed that if they found an intentional stabbing, they should only apportion negligence between Flood and Southland. See the discussion in part 4, *supra.* In that case, of course, the jury would consider whether the stabbing was an unforeseeable intervening act.

8. *Instruction on status of Southland as an expert in security.* Both in her original and supplemental charge, the judge told the jury that Southland could be "held to the standard of an expert in connection with providing security for its customers." She should not have done so. "The shortcoming of the . . . instruction is that it . . . directed the

jury to require of [Southland] the knowledge and skill of some unspecified 'expert' rather than the knowledge and skill of a reasonable person in the same circumstances (including, of course, the circumstance of being [a nationwide owner and operator of twenty-four hour convenience stores])." *Back* v. *Wickes Corp.*, 375 Mass. 633, 643 (1978).

9. *Instruction on the amount of the damages.* In the context of the entire charge on damages, there was no error in the judge's admonition to the jury (although better left unsaid) that they should, in arriving at a total award of damages, "not be disturbed by how large the amount is, because this would be the total amount [the plaintiff] will ever be able to recover for these injuries."

10. *The instruction on comparative negligence.* The judge submitted the case to the jury on special questions. Mass.R.Civ.P. 49(a), 365 Mass. 812 (1974). Question seven directed that the jury apportion a percentage of negligence to each party found causally negligent so that the total apportioned equaled 100 percent. Question ten directed that the jury determine the total compensation for Flood's injuries and instructed the jury not to reduce the total by the percentage of causal negligence, if any, attributed to Flood. The judge also instructed the jury that Flood could recover if he was fifty percent responsible or less but that his recovery would be diminished by the percentage of negligence attributed to him.

After the jury had deliberated for two days, they informed the judge that they could reach a verdict on all questions if their verdicts on questions seven and ten were "binding" on the final disposition. The judge provided further instructions regarding the answers to each of the special questions, and she repeated that if the jury found Flood more than fifty percent negligent, he would not recover any damages. The jury foreman again questioned whether the jury's finding on questions seven and ten "on the amount of damages" could be "set aside." The judge responded that the jury should not concern themselves with that. At a bench conference, counsel for Southland explained that the jury were asking about the

nexus between questions seven and ten and requested that the judge instruct the jury on the effects of joint and several liability. The judge, noting that the jury might be confused, declined to issue an instruction on joint and several liability.[6]

Southland contends that the judge's failure to issue an instruction on the effects of joint and several liability was an abuse of discretion. Southland argues that the jury was misled by the judge's instruction because, by informing the jury that Flood's recovery would be reduced by the percentage of negligence allocated to him and that he would not recover at all if he was more than fifty percent negligent, the jury could only have believed that the defendants' respective liabilities would be proportional to the percentage of negligence allocated to them, and the failure to give the instructions on joint and several liability was unfair in the circumstances.

"[W]e held in . . . *Kettinger* v. *Black & Decker Mfg. Co.*, 13 Mass. App. Ct. 993, 994-995 (1982), that, just as the use of special questions is discretionary with the judge, so is it discretionary to describe the consequences of jury answers to special questions on comparative negligence, whether by means of instructions or responses to questions put by the jury. . . . Comparative negligence is not an easy subject. . . . We would point to the danger of the jury's speculating in the dark about possible consequences and would leave it to the judge . . . to sense — having in view the facts of the particular case, any appeals therein to prejudice over reason, and the style of any inquiries from the jury — whether elucidation with necessary warnings would be likely to help or hurt." *Thurston* v. *Ballou*, 23 Mass. App. Ct. 737, 742-743 (1987).

As we recognized in *Thurston* (at 742 & n.8), there is a split of judicial opinion about the propriety and advisability of telling a jury about the legal results which may flow from their answers to special questions on comparative negligence.

---

[6]Southland had previously asked the judge to instruct the jury on this issue "as part of the comparative negligence law" during the charge conference. The judge, in her discretion, decided against issuing this instruction.

See the authorities collected in 9 Wright & Miller, Federal Practice and Procedure § 2509 (1971 & Supp. 1992). See also Schwartz, Comparative Negligence § 17.5 (2d ed. 1986 & Supp. 1990).[7]

While the decision to instruct a jury in a comparative negligence case on the legal effects of their answers to special questions is within the sound discretion of the judge, once the judge gives an instruction on such effects as to one party, as she did here twice on the answer as to the comparative negligence of Flood, she should, in fairness, on request of another party or in response to questions from the jury, instruct on the consequences of answers which affect another party.[8] In the circumstances, the judge, in her original charge or in response to the questions of the jury, should have told the jury that contribution to the damage award to Flood would not be determined by apportionment based on the relative degrees of fault of Darcy and Southland as determined by the jury but under rules of joint and several liability, with rights of contribution to a defendant who pays more than a pro rata share. See *Zeller* v. *Cantu*, 395 Mass. 76 (1985).

11. *Other claims of error.* We have considered other glancing claims of error by Southland and conclude that they are without merit.

12. *Conclusion.* Southland makes no argument with respect to damages other than the one we have disposed of in part 9, *supra*. Thus, the total amount of damages found by the jury shall stand. The judgment is vacated, and the case is remanded to the Superior Court for a new trial as to all par-

---

[7]Both treatises take the view that it is the better position that the jury should be told of the legal effects of their determinations.

[8]"[A]n attempt to keep the jury in the dark as to the effect of its answers is likely to be unavailing, and there is always the danger that the jury will guess wrong about the law, and may shape its answers to the special [questions], contrary to its actual beliefs, in a mistaken attempt to ensure the result it deems desirable." Wright & Miller, *supra* at 513. Wright, The Use of Special Verdicts in Federal Court, 38 F.R.D. 199, 206 (1965). In this case, it appears that the danger may have been realized.

ties on liability only. See G. L. c. 231, § 132; Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974).

*So ordered.*