ADOPTION OF PAULA[1]
(and six companion cases[2]).
CARE AND PROTECTION OF PAULA & others.[3]

Middlesex. March 9, 1995. - June 30, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, & GREANEY, JJ.

*Parent and Child*, Care and protection of minor, Adoption, Dispensing with parent's consent to adoption. *Minor*, Care and protection. *Adoption*, Care and protection, Dispensing with parent's consent. *Practice, Civil*, Care and protection proceeding, Moot case. *Evidence*, Child custody proceeding, Expert opinion, Hearsay, Report of licensed social worker, Police report, Business record, Deposition. *Witness*, Expert. *Due Process of Law*, Child custody proceeding.

In a proceeding to dispense with parental consent to adoption of minor children in Probate Court, no prejudicial error arose from the admission in evidence of findings from prior District Court care and protection proceedings which was repetitive of other properly admitted evidence. [721-722]

In a proceeding to dispense with parental consent to the adoption of minor children under G. L. c. 210, § 3, the testimony of an investigator appointed in the District Court pursuant to G. L. c. 119, § 24, in the underlying care and protection proceedings was properly admitted in evidence on the issue of the father's parental fitness. [722-726]

In a proceeding to dispense with parental consent to adoption, the father did not demonstrate any prejudice from the admission in evidence of certain written reports of a court-appointed investigator, of a guardian ad litem and of certain records of the Department of Social Services

---

[1]All of the names used in this opinion are pseudonyms.

[2]Separate petitions were filed by the Department of Social Services (department) on behalf of Paula and her six half-sisters, Phyllis, Jennifer, Susan, Kimberly, Diane, and Elizabeth, pursuant to G. L. c. 210, § 3 (1992 ed.).

[3]One petition for care and protection was filed by the department, pursuant to G. L. c. 119, § 24 (1992 ed.), on behalf of Paula, and her five half-sisters then born. The care and protection petition initially concerned two additional children, Robert and Belinda, the father's children from his first marriage. They are not involved in the appeal from the petition.

[726-727]; further, admission in evidence of a police report as a business record was proper [727].

Proof of a father's past and present unfitness as a parent was overwhelming and there was no error in the decision to dispense with his consent to the adoption of his children. [727-728]

In a proceeding to dispense with a mother's consent to the adoption of her seven children, the record demonstrated clear and convincing evidence of the mother's current unfitness to care for her children. [728-730]

Upon a probate judge's termination of parental rights by the granting of an adoption petition dispensing with parental consent to adoption of children who had previously been adjudicated in need of care and protection, the decisions in the care and protection cases and related proceedings were rendered moot and appeals therefrom were dismissed. [730-732]

The court stated that under Dist./Mun. Cts. R. Civ. P. 81 (a), decisions on the deposition of prospective witnesses are committed to the sound discretion of the trial judge. [732-734]

PETITIONS filed in the Malden Division of the District Court Department on December 22, 1988.

The cases were heard by *Paul J. Cavanaugh*, J., and hearings for substitute care review and for review and redetermination were held before him.

PETITIONS filed in the Middlesex Division of the Probate and Family Court Department on July 17, 1991.

The cases were heard by *Beverly Weinger Boorstein*, J.

The Supreme Judicial Court granted applications for direct appellate review.

*Michael F. Kilkelly* for the father.

*Lucille DiPietro* for the mother.

*Elizabeth A. Keliher*, Assistant Attorney General, for Department of Social Services.

*Nan Myerson Evans* for five minors.

*Charles G. Murphy* for one minor.

*Donna M. Schofield* for one minor.

GREANEY, J. In 1991, after a trial held over numerous dates in 1989 and 1990, a District Court judge adjudicated Paula and her five half-sisters, Phyllis, Jennifer, Susan, Kimberly, and Diane, to be children in need of care and pro-

tection, and committed them to the custody of the Department of Social Services (department) pursuant to G. L. c. 119, § 24 (1992 ed.). Substitute care review hearings were held, pursuant to G. L. c. 119, § 29B (1992 ed.), resulting in approval of the substitute care plan submitted by the department which had as its goal adoption of the children. In 1992, a District Court judge held a review and redetermination hearing on the question of custody, pursuant to G. L. c. 119, § 26 (1992 ed.). Custody of the children remained with the department. Both parents appealed from the three foregoing decisions, adjudications, and orders. The appeals were consolidated, and we granted the father's application for direct appellate review.

In 1993, after a twelve day trial, a judge in the Probate and Family Court entered comprehensive findings of fact and conclusions of law, in which she granted petitions filed by the department, pertaining to Paula, Phyllis, Jennifer, Susan, Kimberly, Diane, and Elizabeth (the mother's youngest daughter by another man[4]), dispensing with the parents' consent to adoption of the girls, pursuant to G. L. c. 210, § 3 (1992 ed.). Both parents appealed from the decrees on the adoption petitions, and we allowed a joint application for direct appellate review. A joint motion to consolidate the appeals from the care and protection petition and related proceedings and the petitions filed pursuant to G. L. c. 210, § 3, was allowed by this court after oral argument.

The mother challenges the results in all the proceedings on the ground that the findings in the respective proceedings failed to give adequate consideration to evidence that she suffered from battered woman syndrome and, after leaving the father, had made significant gains in her ability to care for her daughters. She also challenges certain evidentiary rulings and alleges that the department made inadequate attempts at reunification before seeking to dispense with parental con-

---

[4]The father of Elizabeth is deceased. Temporary custody of Elizabeth had been granted to the department in the fall of 1990. The record does not indicate an appeal from this adjudication.

sent to adoption. The father challenges a number of evidentiary rulings in both the Probate and the District Court proceedings. He also argues that the adoption plans presented by the department were inadequate. We affirm the decrees entered in the Probate Court and, therefore, dismiss as moot the appeals from the three District Court proceedings.

1. *Factual background.* We summarize the background findings of the Probate and Family Court judge with respect to parental fitness. Additional evidence and findings will be discussed in connection with various issues raised by the parents.

The mother and the father met in January, 1981, and commenced living together shortly thereafter. In addition to the parents, the household included the father's father, his two children by his first marriage (Robert and Belinda) and Paula, the mother's eldest daughter. The parents had five daughters in rapid succession, the first of whom, Phyllis, was born on October 11, 1981. They married in 1984.

Both parents were episodic users of drugs and chronic abusers of alcohol during their marriage. The parents' relationship was characterized by a high level of conflict. The father physically abused the mother. He also hit the children, focusing this violence in particular on Paula, who was not his daughter. The mother was aware of his treatment of the children. After confrontations with her husband, the mother would "run" from the household. She would be absent for periods ranging from a few days to several weeks at a time. At first, she took the children with her. When the number of children increased, she would leave them behind. The care of the younger children was often delegated to Robert and Belinda, especially when the mother left the home. Although the housekeeping was adequate, there was great material deprivation in the home: there were not enough beds for all the children, nor was there any privacy barrier between Robert and the female children. It was noted in school reports that the children were dressed in dirty, ill-fitting clothing, often inappropriate to the season. Dangerous weapons were openly displayed in the home. In addition, a number of tran-

sient people, many of them adolescents drawn by the availability of drugs and alcohol, frequented the home. Some of these people also acted as caretakers for the children.

In July, 1988, the mother initiated what turned out to be a final break with the father. She abandoned the home, leaving the children behind. Within the next few months, several reports of abuse or neglect concerning the children were filed with the department. The reports were substantiated, primarily on the basis of neglect. Sexual abuse of Paula and Phyllis by Robert was also substantiated. In December, 1988, the department sought and obtained temporary custody of the children.

After the mother left the marital home, she became involved with a man and became pregnant by him (with Elizabeth). This man died of an overdose of heroin in July, 1989.[5] When Elizabeth, born on March 9, 1990, was an infant, the mother participated in a residential drug treatment program at the Medford Family Life Education Center. She was terminated from the program almost immediately for violation of the program's rules. She spent nights drinking with a new boy friend, attempted to bring alcohol into the shelter, and left Elizabeth with other program residents for extended periods of time. The department substantiated allegations of neglect with respect to Elizabeth, and it was awarded custody of the child in August, 1990. Elizabeth has significant deficits in hearing and will require intensive therapy with parental participation to acquire verbal communication skills.

At the time of trial, the mother had been living with Gerald, the father of her son, James, born on July 16, 1991,[6] and had named him as a potential caretaker of her daughters. There were allegations that Gerald had physically abused his children by other women, and had the potential to repeat this violent behavior and that the children, with the exception of

---

[5] The judge found that Elizabeth's father died in July, 1989. The record indicates he may have died in July, 1990. Nothing turns on this discrepancy.

[6] James is not a subject of the proceedings before this court.

Phyllis, regarded him with reservations as a caretaker. Several people had observed episodes of his inappropriate physical contact with some of the children, and in particular with Phyllis, whose sexualized behavior placed her at high risk.

The father has remarried and at the time of trial, had three additional children by his new wife. He testified that he was not seeking custody of his children (Phyllis, Jennifer, Susan, Kimberly, and Diane), but took the position they should be returned to their mother's custody.

While it was apparent that the mother cared about her children and could, to some extent, identify their individual needs, the judge concluded that she remained unable to acknowledge the damage caused to her children by the "chaotic, frightening and harmful environment" which had existed in the marital home, and that she did not understand the "causes and manifestations of child abuse" and would, therefore, be unable to protect her children from renewed abuse. In her relationship with Gerald, she appeared ready to replicate the abusive relationship she had had with the father and she did not understand the threat to her children posed by Gerald's behavior. In addition, the judge concluded, the mother had formulated no realistic plan for caring for eight children, most of whom would be unusually needy. The judge granted the department's petitions to dispense with parental consent to the adoption of the children.

We turn now to the parents' assertions of error in the adoption proceedings.

2. *Care and protection findings.* Over both parents' objections, and despite their allegations of error in the unresolved appeals, the findings from the care and protection proceeding were admitted in evidence at the trial of the adoption petitions. As was indicated in *Adoption of Frederick*, 405 Mass. 1, 12 (1989), findings of fact in a care and protection proceeding which are not "out of date, or the product of a proceeding where the parent may not have a compelling incentive to litigate . . . may be introduced in evidence at the trial on a petition to dispense with consent to adoption to the extent that they are both relevant and material." The parties

and the judge are not bound by the findings which carry no special evidentiary weight, and evidence may be offered at the adoption proceeding by any party on any of the issues covered by the findings either to support or contradict them. *Id.* at 6-7. We think, however, that the better practice would be for a judge to decline to admit as evidence in an adoption proceeding findings from an underlying care and protection proceeding that are on appeal. In admitting the findings, the judge noted that they were on appeal, "which [made] it a little different from the cases that [she had] read." She stated that she would assign weight to the findings accordingly. They would have been relevant primarily on the issue of conditions in the marital home prior to July, 1988. Evidence on this point was available in admissible documents, and, as we shall explain below, was the subject of proper direct and detailed testimony by witnesses subject to cross-examination, who identified their sources of information. In citations in her findings of fact to the exhibits and documents on which she had relied, the judge did not reference the care and protection findings. Since the findings from the care and protection proceeding were repetitive of other, properly admitted evidence, no prejudicial error could arise from their admission. See *Adoption of Mary*, 414 Mass. 705, 710 (1993).

3. *Father's fitness.* The father raises numerous objections to the admission of evidence in the adoption case.[7] We ad-

---

[7]The father also contends that the adoption plans proposed by the department were deficient. There is no prospect that either biological parent of the children can offer them an acceptable home, nor has either parent suggested a viable alternative within the natural family. See *Care & Protection of Three Minors*, 392 Mass. 704, 715 (1984).

With so many children involved, adoption by a single family is extremely unlikely, and the guardian ad litem's report states her belief that, although sibling contact should be maintained, placement in a single home would not be preferable for the children, who need considerable individual attention. The department indicated that it would explore a permanent home for Paula with the foster family with which all of the children except for Elizabeth have lived for some time. The foster family has expressed an interest in adopting or accepting guardianship responsibility for Paula. The department also indicated that it hoped to place Jennifer and Susan in the

dress only those issues which require discussion.[8]

a. *Admissibility of the court-appointed investigator's testimony.* The department's first witness in the adoption matter was the investigator appointed in the District Court pursuant to G. L. c. 119, § 24,[9] in the underlying care and protection proceeding. Reports she had submitted to the District Court in her capacity as investigator also were admitted, over the father's objection.[10] She testified, based on first-hand observation, to conditions in the marital home prior to and around December, 1988, when the children were removed from the father's custody. On the basis of conversations with the mother and the father, she also testified to the abusive nature of the marital relationship. There was no objection to this testimony.

---

foster home in which Elizabeth has been living. This family has expressed an interest in adopting all three children. The department, acknowledging that Phyllis, who has perhaps the strongest attachment to her mother, might have difficulty succeeding in an adoptive home, indicated that it would in her case consider long-term foster care with on-going visitation with the mother. As to the remaining children, the department indicated that once they were freed for adoption, it would use various resources to recruit adoptive families for them.

The department's plans indicate that it intends to accept the guardian ad litem's recommendation that, after adoption, the children have continued contact with each other and with their biological mother. With the future status of the children unclear pending the outcome on the petitions under G. L. c. 210, § 3, the department could not do more than outline in general terms its plans for the children. A fully developed adoption plan, while preferable, is not an essential element of proof in a petition brought by the department under G. L. c. 210, § 3.

[8]We decline to address allegations of error raised by the father having relevance only to the fitness of the mother.

[9]General Laws c. 119, § 24 (1992 ed.), provides, in pertinent part:

"Upon the issuance of the precept and order of notice the court shall appoint a person qualified under section twenty-one, to make a report to the court under oath of an investigation into conditions affecting the child. Said report shall then be attached to the [care and protection] petition and be on a part of the record."

[10]The mother also objected at trial to the admission of these reports (other than regarding Elizabeth), but she makes no argument on appeal that their admission was error.

The father objected, on the ground of hearsay, to portions of the investigator's testimony that depended primarily on conversations she had had with the children and which she deemed reliable because she received consistent reports from all of the younger children with whom she spoke. On the basis of these conversations, the investigator testified that, even while the parents were together, primary responsibility for the daily care of the younger children was delegated to Robert and Belinda. The children complained of harsh treatment by their older siblings. According to the children, there were regular parties with lots of strangers in the house. The children also were the primary source of information about the extent of the father's physical abuse. The children agreed that Paula, who, as the father's stepdaughter became the family scapegoat, received almost daily beatings from her stepfather, Belinda, and Robert. In addition, the father slapped Phyllis hard and repeatedly for her inattention (which was a function of her disturbed mental state). This testimony is reflected in the judge's findings of fact.[11]

It is well settled that "the report of an investigator appointed under § 24 may contain hearsay," *Custody of Michel*, 28 Mass. App. Ct. 260, 266 (1990), see *Adoption of Carla*, 416 Mass. 510, 514 (1993), and that the investigator may testify in the care and protection proceeding to information based on out-of-court conversations with various sources of information, where the parents are permitted "an opportunity to refute the investigator and the investigator's sources through cross-examination and other means." *Custody of Michel, supra.* See *Adoption of Carla, supra.* The admissibility of the report and testimony of a guardian ad litem appointed by a judge of a Probate and Family Court in connec-

---

[11]We cannot accept the department's contention that, even if erroneous, admission of this evidence resulted in no prejudice to the father. Although the judge did not reference the investigator's testimony in her findings of fact, the findings recounting the conditions in the marital home prior to December, 1988, plainly indicate reliance on, and acceptance of, that testimony. In certain instances, the findings reflect the testimony of the investigator verbatim.

tion with an adoption case, pursuant to G. L. c. 215, § 56A (1992 ed.), is governed by the same principle. See *Adoption of Sean*, 36 Mass. App. Ct. 261, 263-264 (1994), and cases cited.

In *Adoption of Mary, supra* at 709-710, we did not reach the issue whether an investigator's written report, prepared pursuant to G. L. c. 119, § 24, would be admissible in an adoption case because the information in the report also was received in the form of direct testimony subject to cross-examination. In *Adoption of Carla, supra*, we again declined to reach that issue because the pertinent information in the reports had been the subject of "live testimony of witnesses subject to cross-examination, *including the investigator*" (emphasis added). *Id.* at 512-513. Although the point may not have been raised directly, these recent cases suggest that an investigator appointed pursuant to G. L. c. 119, § 24, in an underlying care and protection proceeding may testify to the results of that investigation in a G. L. c. 210, § 3, proceeding on a petition to dispense with parental consent to adoption as long as the investigator's sources are identified and available for cross-examination, thereby providing the parents with "an opportunity to rebut any adverse or erroneous [information in the investigator's testimony]." *Adoption of Sean, supra* at 264.

A judge's appointment of an investigator under G. L. c. 119, § 24, "signifies . . . that the licensed social worker has the training and specialized knowledge . . . to make and report acute observations about the interactions of family members and their respective mental conditions." *Custody of Michel*, 28 Mass. App. Ct. 260, 266 (1990). This material, gathered by an impartial observer, generally is the most reliable source for the development of an informed assessment of a family's background and the events that led to the filing of the petition under G. L. c. 210, § 3. The decision in *Adoption of Frederick, supra*, ruling admissible in a proceeding under G. L. c. 210, § 3, the findings made in an underlying care and protection proceeding, clearly rests on a recognition of the need in an adoption case for accurate information

about a family's prior circumstances. Live testimony about the results of an investigation undertaken in connection with a care and protection petition, limited to issues that remain relevant to a determination on a petition under G. L. c. 210, § 3, and to information from sources whose reliability is established or may be tested by cross-examination, in fact poses less of a threat to a parent's interests than does the admission of the care and protection findings. We conclude, therefore, that the judge did not err in permitting the investigator appointed in connection with the care and protection proceeding, to testify at the trial on the petitions brought under G. L. c. 210, § 3, to dispense with parental consent to adoption.

The investigator's testimony found strong support in the report and testimony of the guardian ad litem, who had spoken with each child about her memories of life in the marital home, and in statements by the mother. The father made no effort to call the children to refute their statements to the investigator or to the guardian ad litem,[12] cf. *Adoption of Kimberly*, 414 Mass. 526, 532-536 (1993), nor did he present any other evidence to dispute the witnesses' accounts of egregious neglect and abuse in the marital home. The judge could rely on this evidence as bearing on the father's parental fitness.

b. *Admission of other evidence.* The father also objected to the admission of other evidence, including the court-

---

[12]The department contended (and the judge appears to have agreed) that the children's out-of-court statements concerning conditions in the marital home could be considered for their truth as the admissions of a party opponent. This cannot be correct. Leaving aside the question whether a child, the subject of a petition under G. L. c. 210, § 3, is a "party" to the proceeding, the child's interests are not sufficiently adverse to the interests of the parent contesting the petition for application of this exception to the hearsay rule. See *Flood* v. *Southland Corp.*, 33 Mass. App. Ct. 287, 294 (1992), *S.C.*, 416 Mass. 62, 70-71 (1993). A child has an interest in common with his or her parent in preserving the familial relationship. See *Care & Protection of Robert*, 408 Mass. 52, 59-62 (1990). Until it is determined that a parent is unfit, the interests of a child and a parent cannot be said to be adverse.

appointed investigator's written reports; written reports by a guardian ad litem appointed in connection with the care and protection petition, submitted to the court; certain records of the department; and a police report. The investigator testified, scrupulously indicated the sources of her information, and was cross-examined. The judge's findings reflect reliance on the testimony in preference to the written reports. We need not decide whether the reports should have been admitted, as their admission could not have prejudiced the father. See *Adoption of Carla*, 416 Mass. 510, 512-513 (1993); *Adoption of Mary*, 414 Mass. 705, 710-711 (1993). The father has not indicated how he was prejudiced by admission of the guardian ad litem and department reports, which do not appear to have figured significantly in the judge's decision. Information in these reports was, in any case, essentially duplicative of the testimony of the investigator appointed in connection with the care and protection proceeding and of the testimony and report of the guardian ad litem appointed in connection with the adoption petitions.

Admission of the police report as a business record was proper. See P.J. Liacos, Massachusetts Evidence § 8.11.1, at 490 (6th ed. 1994), and cases cited. The report was a record of the officers' first-hand observations of conditions in the marital home in October, 1988, when police executed a search warrant on the premises. They observed open beer cans strewn around the house, numerous underage guests who had been drinking, wholly inadequate sleeping arrangements for the children, including a broken window in the bedroom, and dangerous weapons openly displayed and accessible.

Information about the father's current circumstances came almost exclusively from his own testimony. The father appeared at the trial on the adoption petitions only on the day on which he testified. He stated that he was not trying "to get [his] children." He was not in a position to take care of them; furthermore, he did not want them because they had

been ruined in foster care.[13] He did not know the dates of the girls' birthdays; he did not differentiate among them in terms of their characters, needs, interests, or ages. At the time of trial, he had not seen his children for seven or eight months.[14] He had never broached with any child the question where she wanted to live. He declined to consent to the adoption of his children because, despite a limited fund of information about the mother's current circumstances, he had decided she was "a perfect candidate to take care of them."

Proof of his past and current unfitness as a parent for Phyllis, Jennifer, Susan, Kimberly, and Diane was overwhelming. There was no error in the decision to dispense with the father's consent to the adoption of his children.

4. *Evidence of the mother's current unfitness.* When faced with a petition to dispense with parental consent to adoption, a judge must "evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interests of the children." *Adoption of Mary, supra* at 710. "The judgment must analyze the parent's character, temperament, capacity and conduct in relation to the particular child's needs, age, affections and environ-

---

[13]He testified as follows:

> *Q*: "Why did you decide that you could not have the care and custody of your children?"
>
> *A*: "Because of what they've gone through in the foster home. They're like they're not my children anymore. They have very bad manners. They have foul language. They don't have any personal hygiene. For me to take them, I'd have to deprogram them, deprogram them to become part of my family. I've got little girls running around with candles, saying that they're praying to God in the middle of a visit — you know, it's just ridiculous what has been done to those kids."

[14]During unsupervised visitation with the children in his home, he had terrified Diane by threatening to cut off her thumb if she did not stop sucking it, and drawing a knife. When the incident was reported to the department, the father's unsupervised visitation with the children was terminated. Two months later, he was told he could resume visitation, but that visits would be supervised and in offices of the department. He declined to visit with the children under these conditions.

ment." *Adoption of Carlos*, 413 Mass. 339, 348 (1992). While a decision of unfitness must be supported by clear and convincing evidence, *id.*, a judge's findings will be disturbed only if they are clearly erroneous. *Adoption of Mary, supra.*

The mother contends that the judge erred in concluding that she was currently unfit to further the best interests of her children by placing undue weight on conditions in the home of the mother and father, and failing to give adequate weight to evidence tending to prove that, since leaving the father, the mother had made gains in her readiness and ability to parent her children. We disagree.

When a parent's living situation has changed, a judge nonetheless properly may rely on evidence of past parental abuse or neglect to the extent that this evidence has relevance to current parental fitness. See *Adoption of Diane*, 400 Mass. 196, 202-204 (1987); *Adoption of George*, 27 Mass. App. Ct. 265, 268-269 (1989). The judge found that the mother remained unable or unwilling to acknowledge the damage done to her daughters (especially to Paula, Phyllis, and Diane) by the chaotic and harmful environment to which they had been exposed in the marital home, and that she continued to deny all responsibility for those conditions. There was credible and consistent testimony that all of the girls had been damaged psychologically, to varying degrees, by their lives in that home. Although the evidence indicated the only "safe" place the children had experienced was their foster homes, the mother in her testimony attributed their well-documented difficulties to their separation from her and their placement in foster care. The judge properly could deduce that the mother had little comprehension of abuse and its effects, and would be unable to protect her children in the future. The mother's involvement with Gerald demonstrated that the risk of exposure to additional abuse if the children remained with the mother was not merely hypothetical.[15]

_____

[15]The guardian ad litem testified that she was concerned about the mother's relationship with Gerald, because he had a documented history of physical child abuse, and admitted that he had hit the child of a former girl friend. She observed that a psychological evaluation of Gerald, done in

There was clear support in the record for the judge's finding that the mother's participation in programs and services, many of which had been provided to her by the department, had favored form over substance, and had not appreciably improved her capacity to "meet the complex emotional and physical needs of her children." She could articulate no realistic plan for meeting those needs, and most of the professionals who had evaluated or assisted her doubted her ability to do so.

The mother's failure cannot be laid at the department's door. It is true that the mother had cooperated with many of the services offered by the department and other providers. At no point, however, did it appear that she was near ready to resume full responsibility for her daughters, who were required, to their detriment, to remain in the limbo of foster care. It was reasonable for the department to seek to dispense with the mother's consent to adoption of the children. Cf. *Adoption of Carlos, supra.*

We do not sit as a trial court to review de novo the evidence presented by the parties. The judge's findings had clear support in the record. Taken together, they constituted clear and convincing evidence of the mother's current unfitness to care for the seven children who are the subject of the petitions brought by the department under G. L. c. 210, § 3.

5. *Review of the care and protection and related proceedings.* A judge considering a petition brought by the department pursuant to G. L. c. 210, § 3, to dispense with parental consent to adoption is required to evaluate whether the parent contesting the petition is fit to provide for the welfare and the best interests of the child whose adoption is being consid-

---

1989, stated that "under stress, he [was] likely to resort to that behavior again." The mother argues that information in this report was confidential and privileged, and could not be relied on by the court. The report was not admitted in evidence, and there was no timely objection to the guardian ad litem's brief testimony about its contents. The question whether this material should have been relied on by the judge was not preserved for consideration on appeal. See *Adoption of Kimberly*, 414 Mass. 526, 533-535 (1993).

ered. See *Adoption of Mary*, *supra* at 710. A termination of parental rights by the granting of an adoption petition is proper only when there is proof, by clear and convincing evidence, that a "parent is currently unfit to further the child's best interest." *Adoption of Carlos*, 413 Mass. 339, 348 (1992). See *Adoption of George*, 27 Mass. App. Ct. 265, 266, 268 (1989). A judge whose order will have the effect of irreversibly terminating the legal parent-child relationship must focus on the present circumstances of the parent and the child, taking into account recent positive gains (if any), and, in appropriate cases, the likelihood of future improvement, in a parent's ability to care for the child who is the subject of the petition. See *Adoption of Carlos*, *supra* at 349-351. For this reason, assuming an appropriate judicial respect for these tenets and sufficient evidence to support the judgment, when a petition brought by the department under G. L. c. 210, § 3, is granted as to a child who previously has been adjudicated in need of care and protection, the decision in the care and protection case, along with related review and redetermination proceedings, are in practical terms rendered moot by a judgment in the adoption proceeding terminating the legal parent-child relationship. See *id.* at 350-351.

The salient issue requiring resolution by the Probate and Family Court judge was whether the mother had achieved the essential gains in her parenting skills that could assure adequate care and stability for her daughters, in view of their individual needs. The judge's comprehensive findings of fact demonstrate that she appreciated the obligation to focus on the current circumstances, abilities, and needs of the mother and the children. She reviewed in detail the evidence bearing on the psychological status, personal strengths, and needs of each child and focused her consideration of the mother's parenting ability on the extent to which the mother had profited from services and gained in skills since departing the marital home in 1988. We have concluded that the judge's findings and decision are adequately supported by admissible evidence, and that the department has proved parental unfitness by clear and convincing evidence. Accordingly, the par-

ents' appeals from the care and protection petition and related proceedings will be dismissed.[16]

We take this opportunity, however, to comment on an issue raised by the father regarding the right of a parent in a care and protection proceeding to take the deposition of a person likely to be called as a witness at trial.

Prior to trial on the care and protection petition, the father filed a motion for leave to take the depositions of certain members of the staff at North Shore Children's Hospital who had contributed to an inpatient evaluation of Phyllis. In support of his motion, the father stated that the pretrial discovery he sought would be essential to his ability to cross-examine these expert witnesses at trial; in addition, because the inpatient unit in which Phyllis had been treated had closed, the depositions might be necessary to preserve the testimony of some of these witnesses. A District Court judge denied the motion.

Under Dist./Mun. Cts. R. Civ. P. 81 (a) (1995), set out in the margin,[17] a party in a care and protection proceeding may depose a prospective witness only by order of the court.

---

[16]The department may file a petition under G. L. c. 210, § 3, to dispense with parental consent to adoption as to any child in its care or custody. See G. L. c. 210, § 3 (*a*). An award to the department of permanent custody of a child under G. L. c. 119, § 24, is not an essential prerequisite to the filing of a petition under G. L. c. 210, § 3. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 62, 67 (1986).

[17]In pertinent part, Dist./ Mun. Cts. R. Civ. P. 81 (a) (1995), provides as follows:

> "These rules apply to all civil proceedings involved in cases traditionally considered tort, contract, replevin, or equity actions, except small claims actions.
>
> "In respects not governed by statute or by other District Court rules, the practice in civil proceedings to which these rules do not apply shall follow the course of the common law, as near to these rules as may be, except that depositions shall not be taken, nor interrogatories served, save by order of the court on motion, with notice, for good cause shown."

Like the law of adoption, see *Adoption of Tammy*, 416 Mass. 205, 210 (1993), the law of care and protection is purely statutory. Therefore, under rule 81 (a), the general rules governing district court procedure (which

The father argues that his Federal and State due process rights to a fundamentally fair trial[18] were violated because application of the rule prevented him from adequately anticipating admissible evidence that was adverse to him.[19] We think that application of the rule to a care and protection proceeding strikes an appropriate balance between the various interests at stake in these cases. See *Care & Protection of Robert*, 408 Mass. 52, 59 (1990) (due process requires balancing individual's interests, risk of erroneous deprivation of those interests, and government's interest in efficient and economic resolution of litigation).

The father sought to depose medical professionals who had authored an inpatient evaluation of one of his daughters. He had access to the report in advance of trial and knew of its contents. The subject matter was neither arcane nor complicated. By the father's reasoning, every professional charged with evaluating a child in connection with a care and protection proceeding could be required to be deposed by either or both of the child's parents. A rule which permitted the taking of depositions as of right would inevitably "complicate the procedure, increase expenses and engender delays," *Care & Protection of Zelda*, 26 Mass. App. Ct. 869, 872 (1989), without appreciably diminishing the likelihood that a parent will be deprived erroneously of his or her child's custody.

---

permit the taking of depositions as of right) do not apply, and the special provision in rule 81 (a) regarding the taking of depositions does apply.

[18]We are unable to determine the basis for the contention that the father's right to equal protection is violated by application of rule 81 (a) to petitions brought under G. L. c. 119, § 24. This rule governs the right to take depositions in all matters affecting a child's custody which are within the jurisdiction of the District Court. It appears the question also is left to the discretion of judges in the Probate and Family and the Juvenile Courts, both of which presently lack specific rules governing the taking of depositions in matters affecting the custody of a child (with the exception of child custody disputes between private parties). Thus, litigants similarly situated are treated similarly with respect to the taking of depositions.

[19]"[W]e have treated the procedural due process protections of the Massachusetts and United States Constitutions identically." *Liability Investigative Fund Effort, Inc.* v. *Massachusetts Medical Professional Ins. Ass'n*, 418 Mass. 436, 443, cert. denied, 115 S. Ct. 666 (1994), and cases cited.

"[T]he importance of a spare and speedy course of procedure in care and protection matters has been explained too often to require further statement here." *Id.* We agree with the department that a parent's right to a fair trial is adequately protected by existing procedural safeguards, including the right to an attorney, a clear and convincing standard of proof at trial, and liberal pretrial access to documents. The right to due process does not, in the setting of a care and protection case, require a right to unlimited pretrial depositions.

Decisions on the scope of discovery are committed to the sound discretion of the trial judge. See *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 799 (1987). The burden is on an appellant to demonstrate a "prejudicial error resulting from an abuse of discretion." *Id.* Even though, as stated above, the appeal is not before us, we note that the record demonstrates no such prejudicial error.

6. *Disposition.* The appeals from the decisions, adjudications, and orders in the care and protection cases, which have not been considered on their merits, are dismissed as moot. The seven decrees entered in the Probate Court allowing the department's petitions to dispense with the parents' consent to adoption are affirmed.

*So ordered.*