In re Karl S. DROWN, Debtor.

Karl S. Drown, Movant,

v.

Raymond Hebert, Respondent.

No. 03–18585–JNF.

United States Bankruptcy Court, D. Massachusetts.

April 3, 2006.

Henry C. Ellis, Assiran, Ellis & Devlin, Taunton, MA, Carolyn J. Campbell, Coo-gen, Smith, McGahan, Lorincz, Jacobi, Susan Jacobs, Volterra, Goldberg, Mangiaratti & Jacobs, Attleboro, MA, John P. Pollis, North Attleborough, MA, Luke, P. Travis, Reed, Boyce and Travis, PC, Fall River, MA, for Debtor.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Objection filed by Karl S. Drown ("Drown" or the "Debtor") to a proof of claim filed in his Chapter 13 case. Raymond Hebert ("Hebert") timely filed the proof of claim in which he represented that the Debtor owes him the sum of $258,750 stemming from a failed development of property known as Lot 1, Smith Street, Dighton, Massachusetts (the "Smith Street property"). Hebert attached to his proof of claim a document captioned, "Hebert vs. Drown," in which he listed various costs and expected fees associated with his acquisition of the Smith Street property, as well as its development, his lost profits, and projected reformation costs.[1]

The Debtor filed an Objection to Hebert's proof of claim seeking its disallowance. Noting that "[t]he basis of the claim is an alleged tort in delineating the wet-

---

1. Hebert listed the following costs and expenses:
 1. $2500 for costs and expenses, actual [sic] expended to date, $816.87
 2. $86,250 as a contingent fee of 1/3rd, based on the following damages:
 a. $75,000 purchase price—land considered of no value
 b. $1,750 engineer's expenses to date
 c. $127,000, loan interest and development expenses to date
 d. $25,000, land reformation required by Dighton Conservation Commission
 e. $30,000 lost profits
 total damages, $258,750 divided by 1/3, $86,250

Hebert also attached to his proof of claim a memorandum from John Freemen "RE: Accounting of Mortgage on Lot 1, Smith St., Dighton." In the memorandum Freeman set forth the following:

| Draws: | 11–29–00 | 85,000.00 |
| | 2–21–01 | 5,400.00 |
| | 3–27–01 | 2,500.00 |
| | 3–29–01 | 6,000.00 |

| Interest Rate 18% per year | |
| Interest Accrued as of 2–1–04 | 56,384.75 |
| Daily Interest per day from 2/1/04 | $49.27 |
| Total Owed as of 2–1–04 | $154,924.75 |

lands of Hebert's vacant lot," the Debtor asserted that damages claimed by Hebert are speculative and that there is no debt due and owing because of the absence of a judgment in Hebert's favor.

The parties filed a joint pretrial memorandum, and the Court conducted a trial on February 3, 2006 at which Hebert and a single expert witness testified, and 18 exhibits were submitted in evidence. The Debtor did not testify, electing instead to move for a directed finding at the conclusion of Hebert's case.

The Court refused to direct a finding and took the Debtor's Objection to the claim under advisement. On February 27, 2006, the Court issued an order directing the parties to submit supplemental memoranda addressing factual and legal issues raised by the evidence presented, including whether the defense of comparative negligence applies to a claim for negligent misrepresentation under Massachusetts law.

The issues presented are whether Hebert sustained his burden of establishing a claim for negligent misrepresentation and, if so, whether the defense of comparative negligence should be a factor in any award of damages.

The following constitute the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr P. 7052.

## II. FACTS

The Debtor filed a Chapter 13 petition on October 14, 2003. On Schedule I, Current Income of Individual Debtor, he listed his occupation as "Health Agent" for the Town of North Attleboro, Massachusetts. In addition to his employment as a health agent, Drown does business as Drown Environmental Services. On invoices submitted to Hebert with respect to a design plan revisions, percolation tests and soil evaluation for the Smith Street property and another property in Dighton located on Elm Street, he listed his areas of expertise as "Percolation Tests," "Septic System Design Plans," "Project Reviews," "Environmental Consultation," "Wetland Delineation," and "Wetlands Evaluation and Review." Although Drown has filed a Chapter 13 plan, his only creditor is Hebert, whose claim he disputes.

Hebert is a knowledgeable and experienced builder having constructed approximately 40 single family houses in southeastern Massachusetts. He also has been employed as a building inspector.

Hebert testified that sometime in 2000, a real estate professional apprised him that the Smith Street lot was for sale. Additionally, Hebert observed a sign posted on the property advertising it for sale by owner. The sign indicated that the lot was "3 plus acres" in size and "buildable."

Hebert executed a purchase and sale agreement for the property on September 25, 2000. Prior to signing the purchase and sale agreement, Hebert obtained a lien certificate from the Town of Dighton and a copy of a plot plan for the Smith Street property showing the location and design of a sewage disposal system, as well as the location of a proposed driveway and four bedroom house and attached garage. Although the septic plan, which was prepared by Drown, was four years old and did not delineate any wetlands, Hebert was assured by the realtor that the lot was buildable.

The parties to the purchase and sale agreement, Hebert and Richard and Lisa Miranda, agreed to a November 30, 2000 closing. Additionally, they agreed that the purchase was "Subject to All Building permitting for a single family dwelling."

The plan Hebert acquired was prepared by Drown and bore his seal as a "Registered Sanitarian." The plan was dated

July 7, 1996 and listed Dushaw Corporation as the applicant with respect to the proposed house and septic system. Although the Debtor included some elevations on the plan in the vicinity of the proposed residence and septic system, he did not clearly delineate any wetlands on the plan. The plan, however, did contain the results of percolation tests which had been performed on May 9, 1996.

In anticipation of the closing, Hebert began developing a house based on the septic plan prepared by the Debtor. Approximately one week before the November 30, 2000 closing, he encountered the Debtor at a property on Elm Street in Dighton where the Debtor was performing soil evaluation and percolation testing for Emmet Field ("Field"), an engineer whom Hebert regularly employed to survey properties for him. Hebert showed the Debtor the septic plan for the Smith Street property and questioned him about the lot, septic design criteria ("Title 5"),[2] and potential problems with wetlands. According to Hebert, the Debtor told him the septic system was well designed and the lot he was acquiring was "a good lot."[3] Neither the Debtor nor Hebert submitted evidence that the Title 5 requirements in 1996 were different from those in effect in November of 2000. Nevertheless, the parties agreed to an exhibit setting forth Title 5 requirements for the preparation of plans and specifications which were in effect in December of 2005. Those requirements are set forth at Appendix 1. Among them is a requirement to delineate wetlands.

2. In *GPT–Acton, LLC v. Dept. of Envtl. Protection,* 64 Mass.App.Ct. 103, 831 N.E.2d 396 (2005), the court explained the regulatory scheme as follows:

> In 1966, the Legislature enacted the Clean Waters Act, G.L. c. 21, §§ 26–53, "to enhance the quality and value of water resources and to establish a program for prevention, control, and abatement of water pollution." G.L. c. 21, § 27. To carry out its responsibilities under G.L. c. 21, § 27(6), DEP is charged with establishing a pollution discharge permit program. G.L. c. 21, § 43(2).
>
> DEP's regulatory scheme for permitting water sewage discharge is two-tiered. Facilities that discharge lower amounts of sewage-less than 10,000 gallons per day— are typically regulated by Title 5. *See* 310 Code Mass. Regs. §§ 15.000 et seq. (1995). Facilities that discharge higher amounts of waste usually require a groundwater discharge permit from DEP, pursuant to 314 Code Mass. Regs. §§ 5.00 et seq. (1996)....
>
> \* \* \* \* \* \*
>
> Title 5 operates through local boards of health (local boards). 310 Code Mass. Regs. § 15.003 (1995). DEP regulations prescribe certain standards for siting, construction, inspection, and other requirements, and local boards employ these standards. 310 Code Mass. Regs. §§ 15.000 et seq. The groundwater discharge permit regulations, which were promulgated in 1983, require all persons who "discharge pollutants to ground waters of the Commonwealth" to secure a valid permit from DEP unless they have the lower flow of sewage, in which case they must comply with Title 5. 314 Code Mass. Regs. § 5.03 (1997). Thus, the regulations effectively operate to require producers of higher amounts of sewage to seek direct DEP approval and employ more stringent pollution control systems, while producers of lower amounts of sewage merely need local board approval and relatively simpler systems.

64 Mass.App.Ct. at 105–106, 831 N.E.2d 396.

3. Hebert testified as follows:

> Q. And what did you ask him:
> A. I asked him, "What can you tell me about the lot?" He did the plan. I asked him, you know, "Does it meet Title 5 requirements? Do I have any problems with wetlands?" There was a note on it telling me how much fill was required for the lot, and we discussed that, and he says, "The plan is what it is. It's a good lot."
> Q. Did he say anything about the wetlands?
> A. No, he did not.
> Q.... [D]id he make any reference to Title 5 or the regulations?
> A. Yes, he said that it passed. I should have no problem whatsoever.

Hebert testified that he deliberately avoided purchasing properties with any potential wetlands issues because of problems he encountered in constructing his own home and the fines he was assessed by the Conservation Commission. He stated: "that's what pretty much taught me to stay away from wetlands." At his deposition, the transcript of which was submitted by agreement as an exhibit, Hebert testified that he showed the Smith Street property to Field who questioned whether there were any wetlands problems. Despite his heightened awareness of problems and increased costs and risks associated with wetland issues, and the concern expressed by Field, Hebert did not obtain an updated Title 5 report or a wetlands analysis from the Debtor or anyone else before closing on the Smith Street property. Although he applied to the Town of Dighton for permits on November 23, 2000 and December 5, 2000 and, although the Mirandas had expressly agreed that Hebert could refuse to close if he was unable to obtain all necessary building permits, Hebert failed to obtain any permits prior to the closing.

Hebert borrowed money from John Freemen ("Freeman") to purchase the lot and develop it. He executed a six-month demand note payable to Freeman in the sum of $225,000 with interest at the rate of 18% per annum, secured by a mortgage on the Smith Street property. Freeman advanced $85,000 at the closing and additional sums thereafter.

Between November 23, 2000 and March 14, 2001, Hebert wrote numerous checks for goods and services to develop the property. According to Hebert's proof of claim, the total sum obtained from Freeman, excluding any interest payments, was $98,540. Hebert submitted checks made payable to various supplier and contractors he engaged in developing the Smith Street property. Excluding checks for services and supplies pertaining to his Elm Street property, which he inadvertently included in exhibit 14, the checks totaled $10,681,-55.[4]

Hebert described the work he performed as follows:

*We put a culvert in to allow the water to run through where the driveway was. We put in a driveway, foundation, brought in stone, cleared the lot, ran rough electricity to the site, put the footings in, had the foundation standing in place . . . .*

(emphasis supplied). Hebert testified that he received verbal approval to begin construction from the building inspector for the Town of Dighton and proceeded with construction at his own risk. He stated:

I was satisfied. I had Mr. Drown's plan that stated that the septic meets Title 5. I submitted all the paperwork to the building inspector. He allowed me to continue with construction at my own risk waiting for the approval from Board of Health.

Hebert was required to perform additional percolation tests on the site. In his deposition, which was submitted as an exhibit, he explained that the part-time employees of the Town of Dighton misplaced the original percolation tests. In early

---

4. Hebert included checks dated before September 25, 2000, the date he executed the purchase and sale agreement. He issued checks totaling $7,360.80 between September 25, 2000 and March 28, 2001, the date of the cease and desist order, including $25 for a lien certificate which he obtained before the purchase and sale agreement. Hebert wrote checks totaling $3,320.75 after March 28, 2001, including checks to Carr Research Laboratory, Inc. and the Clerk of the Bristol County Superior Court, each in the amount of $500.

January 2001, the Board of Health agent who was at the Smith Street property to oversee the so-called "perc tests," raised a question about wetlands. According to Hebert, he contacted the Debtor who revised his original plan delineating wetlands in the rear of the three acre parcel. The revised plan, dated March 1, 2001, shows a relatively small area of wetland. On March 1, 2001, the Debtor submitted an invoice to Hebert for this work in the sum of $150.

Although the percolation tests were successful, on March 14, 2001, the Conservation Commission for the Town of Dighton issued a "WPA Form 9A–Enforcement Order," which referenced the Massachusetts Wetlands Protection Act, Mass. Gen. Laws. ch. 131, § 40. In Part A, "Violation Information" the Commission noted the following: "Construction of foundation in wetlands. Filled in drive. No filing made. No building permit." The Conservation Commission ordered Hebert to "immediately cease and desist from the further activity affecting the Buffer Zone and/or wetland resource areas on this property." Two weeks later, on March 28, 2001, the Conservation Commission issued a follow-up WPA Form 9A in which it noted: "Footing constructed in wetlands, Filled-in driveway in wetlands. Violator was denied septic permit and building permit." In an attachment to the Enforcement Order, the Commission stated:

> The wetland delineation showed that the driveway, garage and possibly part of the house were in the wetlands. The Board of Health refused to issue a septic permit.
>
> The Dighton Conservation Commission hereby orders Raymond J. Hebert to

submit a plan for restoration to this Commission within thirty (30) days of the issuance of this Order. This plan should include the removal of the driveway, backing filling [sic] of the footing, replanting of wetland vegetation and a time schedule of the proposed work. If the plan is agreeable to the Commission, work to restore will be authorized.

Shortly after the Commission issued its March 28, 2001 Enforcement Order, on May 21, 2001, the Town of Dighton adopted a new conservation by-law. Hebert testified that as a result of that by-law, the Smith Street lot, for which he paid $75,000, was unbuildable as there was simply no place to construct the house and septic system without infringing on the 100 foot buffer between wetlands and buildable areas.[5]

After receiving the cease and desist orders from the Conservation Commission members, Hebert employed Carr Research Laboratory, Inc. ("Carr"), recognized experts in the field of soil evaluation, to delineate wetlands at Smith Street property. Scott Goddard ("Goddard"), an Ecological Engineer and Certified Wetland Scientist with Carr, prepared a "Wetland Border Report," dated April 2, 2001, for Hebert. Goddard testified that he "flagged" or delineated the wetland border on the parcel. In his Report, which was submitted in evidence as an exhibit, he noted that "[t]he wetland flags delineate Bordering Vegetated Wetlands (BVW) associated with two different intermittent streams present on-site." He also testified that wetlands can change over time. There was no evidence, however, that Lot 1 was wetter in 2001 than it was in 1996.

---

**5.** The By-law provides: "No subsurface sewage disposal system will be permitted within the 100 foot buffer zone of any wetland nor within 200 feet of any perennial stream ...."

It further provides: "No dwelling or structure shall be build less than 50 feet from the outer edge of any wetland."

Field prepared a plot plan showing the location of the wetland flags, which also was submitted in evidence. Hebert also submitted a plot plan showing the wetland areas in blue and a 50 foot buffer required to satisfy Title 5. According to Goddard, the buffer under the Wetlands Protection Act, is 100 feet. From the plan, it is evident that the driveway as shown on the plan prepared by the Debtor was in wetlands and that the house and garage were in the buffer zone; only the septic system appears to be located outside the 50 foot buffer zone. A comparison of Field's plan and those prepared by the Debtor is remarkable because the location of the house and an old cemetery on the property are oriented differently on the lot. Hebert testified that the Debtor's plans were riddled with errors. According to Hebert, not only did the plans prepared by Drown fail to accurately delineate the wetlands, the elevations were wrong as well.

Hebert testified about what the plans revealed; Goddard's testimony substantiated Hebert's testimony.[6] Hebert and Goddard also testified as to the costs of restoring the property. Goddard stated the following:

[A]ccording to the enforcement order and field practice, what would need—the steps to go forward from here would be to have more detailed site survey done and [a] plan generated. It would have to be filed a notice of intent with the Dighton Conservation Commission. [sic]

Along with that would have to be a report generated describing how the wetlands were to be restored and probably specify some details in terms of planting some soil types [sic] and so forth. And the field work itself after the public hearings were closed and approved by the Dighton Conservation

Commission would consist likely of installation of erosion control, field monitoring by a wetland expert, removal of material by heavy machinery, confirmation of soil types or soil enhancement, if necessary, depending on where the fill goes to and what type of material is found when it's excavated, revegetation of the area to replanting native species, and likely a monitoring program for tow growing seasons to the Dighton Conservation Commission.

And when all that work was completed, it would probably need to be follow-up survey to show that it was done as it was approved, along with the acquisition of a certificate of compliance from the Conservation Commission to show that all work according to the permit was finished.

Goddard estimated that the work he described would cost between $15,000 and $20,000. Hebert's estimate was higher; $25,000.

Hebert admitted that he has not done any work to restore the wetlands on Lot 1 since he received the March 28, 2001 cease and desist order. He also testified that he has not attempted to repay Freeman.

## III. POSITION OF THE PARTIES

### A. *Hebert*

Hebert argues that the facts are not in dispute and that based on the Debtor's negligent misrepresentations, he purchased the lot on Smith Street in Dighton. He maintains that he relied on the 1996 septic system plan prepared by the Debtor as well as the conversation he had with the Debtor one week prior to the closing, adding that he would not have purchased the

6. Goddard also noted that his investigation of the property revealed that it was a habitat for an endangered species, the Hessel's Hairstreak moth.

site if he had known that wetlands were a problem.

According to Hebert, the Debtor falsely represented that the Smith Street property did not contain wetlands and that it complied with Title 5 requirements. Citing *Nota Constr. Corp. v. Keyes Assoc. Inc.*, 45 Mass.App.Ct. 15, 694 N.E.2d 401 (1998), Hebert argues that a third party can sustain a claim against a professional who provides services to another, despite a lack of privity. According to Hebert, the Debtor provided false information for guidance in the course of his business transactions, which caused him significant economic harm. Hebert argues that his reliance on the Debtor's plans was justifiable, and that he sustained damages.

### B. *The Debtor*

The Debtor argues that his representations were gratuitous and, therefore, Hebert is required to establish gross negligence to support his claim. He contends that Hebert did not prove ordinary negligence, let alone gross negligence. He further contends that Hebert did not employ him to do a wetlands delineation and did not pay him for such services. According to the Debtor, Hebert's engineer engaged him to do percolation tests on the Smith Street property which were satisfactory. In connection with their conversation about the Smith Street lot, which took place before the November 30, 2000 closing, the Debtor states that he simply reviewed the plan gratuitously and made only a representation that the 1996 plan met Title 5 requirements for septic systems.

The Debtor insists that Hebert has not shown either justifiable or reasonable reliance. He contends that there is no proof of any negligence, and Hebert is not entitled to recover for any pecuniary losses.

## IV. DISCUSSION

### A. *Introduction*

At the outset, the Court reiterates its denial of the Debtor's request for a directed finding. The Court finds that while the facts are substantially uncontested, the Debtor's potential liability warrants close examination.

The Court also observes that the basis of Hebert's proof of claim was "services performed" and not negligent misrepresentation. Because both parties in their briefs framed the legal issue presented as negligent misrepresentation and litigated the contested matter on this theory, the Court shall analyze Hebert's claim on this basis.

### B. *Applicable Law*

#### 1. Burden of Proof

 The allowance of the proof of claim is determined with reference to applicable state law. *See* 11 U.S.C. § 502(b)(1); *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Once an objecting party has submitted evidence contradicting the validity of the proof of claim, the claimant has the ultimate burden of proving its claim. *See* Fed. R. Bankr.P. 3001(f). Applying these well-recognized standards to this case, it is evident, and the parties recognized, that Hebert has the ultimate burden of establishing the tort of negligent misrepresentation.

#### 2. Negligent Misrepresentation

 Massachusetts law recognizes claims for negligent misrepresentation and utilizes the liability standard set forth in the Restatement (Second) of Torts § 552 (1977). *See Nycal Corp. v. KPMG Peat*

*Marwick LLP,* 426 Mass. 491, 496, 688 N.E.2d 1368 (1998). According to the Supreme Judicial Court,

> Section 552 describes the tort of negligent misrepresentation committed in the process of supplying information for the guidance of others as follows:
>
> '(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'
>
> That liability is limited to 'loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.'

426 Mass. at 496, 688 N.E.2d 1368 (citing Restatement (Second) of Torts, § 552). According to the Supreme Judicial Court, the policy supporting § 552 is that

> [T]he duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. A user of commercial information cannot reasonably expect its maker to have undertaken to satisfy this obligation unless the terms of the obligation were known to him. Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.

*Nycal Corp.,* 426 Mass. at 496–97, 688 N.E.2d 1368 (citing comment a).

■ Privity of contract is not required to establish a claim for negligent misrepresentation. *See Craig v. Everett M. Brooks Co.,* 351 Mass. 497, 222 N.E.2d 752 (1967). The court in *Nycal Corp.* described the facts in *Craig* as follows:

> the plaintiff, a general contractor, and the defendant, a civil engineer and surveyor, each had a contract with the same real estate developer. The defendant placed stakes on the developer's real estate to enable the plaintiff to build roads.... The defendant knew that the plaintiff was the contractor, and that the work which the plaintiff was contracted to perform would be in accordance with the defendant's stakes.... Because the defendant knew the plaintiff's identity, and the precise purpose for which the work was to be performed, as well as that the plaintiff would be relying on the work, we held that there would be recovery despite the lack of a contractual relation.

*Nycal Corp.,* 426 Mass. at 495, 688 N.E.2d 1368 (citations omitted). It added: " 'The rule in *Craig* has been referred to as "the *Craig* principle of foreseeable reliance," and subsequent cases rely on *Craig* for the proposition that recovery for negligent misrepresentation is limited to situations where the defendant knew that a particular plaintiff would rely on the defendant's services.' " *Id.* (citations omitted).

 Although it must be foreseeable to the defendant that the plaintiff will rely upon his representation, the plaintiff must establish that his reliance was justifiable. *Nycal Corp.,* 426 Mass. at 496, 688 N.E.2d 1368; Restatement (Second) of Torts, § 552. In *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the United States Supreme Court, in the context of a claim under 11 U.S.C. § 523(a)(2), articulated the standard to be employed for determining whether reliance is justified. Given that justifiable reliance is both a necessary element of a cause of action under § 523(a)(2) and for negligent misrepresentation under Massachusetts law, this Court shall be guided by the Supreme Court statement of the applicable standard. In *Field v. Mans,* the Court stated the following:

> The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." *Id.,* § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. *Id.,* § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man.

Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.,* § 545A, Comment b. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is *"required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.* Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." *Id.,* § 541, Comment a.

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971); (footnotes omitted);

*accord,* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, p. 752 (5th ed. 1984) (Prosser & Keeton). Prosser represents common-law authority as rejecting the reasonable person standard here, stating that "the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Prosser, *supra,* § 108, at 717; *accord,* Prosser & Keeton, § 108, at 751; *see also* 1 F. Harper & F. James, Law of Torts § 7.12, pp. 581–583 (1956) (rejecting reasonableness standard in misrepresentation cases in favor of justifiability and stating that "by the distinct tendency of modern cases, the plaintiff is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiff's failure to make the investigation or examination to verify the same") (footnote omitted); *accord,* 2 F. Harper, F. James, & O. Gray, Law of Torts § 7.12, pp. 455–458 (2d ed.1986).

516 U.S. at 70–72, 116 S.Ct. 437(footnotes omitted).

### B. *Analysis*

#### 1. Negligent Misrepresentation

Based upon the applicable standard, Hebert was required to prove that the Debtor in the course of his business supplied him with false information knowing that the information he was producing was for the guidance of others in their business transactions. Moreover, Hebert was required to prove that the Debtor failed to exercise reasonable care or competence in obtaining or communicating information upon which he justifiably relied and which

caused him pecuniary loss. *See Golber v. Baybank Valley Trust Co.,* 46 Mass.App. Ct. 256, 257, 704 N.E.2d 1191 (1999); *Fox v. F & J Gattozzi Corp.,* 41 Mass.App.Ct. 581, 672 N.E.2d 547 (1996); and *Josefek v. Loitherstein Envtl. Eng'g, Inc.,* No. 032156, 2004 WL 3218004 (Mass. Superior Court December 31, 2004).

▪ The Court finds that Hebert has sustained his burden of establishing that the Debtor supplied him with false information and that the Debtor was aware that the plan he had prepared in 1996 was being used by Hebert to acquire and develop the Smith Street property in 2000. In particular, the Court finds that Hebert demonstrated that Drown failed to exercise reasonable care or competence in communicating information about the Smith Street lot to him during their conversation which occurred about one week before the closing.

The Debtor drafted the 1996 plan for Dushaw Corp., not Miranda, Hebert's seller. In late November, 2000, however, the Debtor learned that Hebert was using his 1996 plan for the proposed development of Lot 1. At that time, Hebert questioned him about the lot, and the Debtor advised him that it was "a good lot." Drown's representations had a business purpose, including maintaining good customer relations and goodwill, because he was performing work for Hebert on Elm Street at the time. Thus, at the time he communicated with the Hebert, the Debtor was remiss in failing to advise Hebert that his plan did not contain a delineation of any wetlands or that the presence of wetlands might imperil the development if the septic system or the house were within the buffer zone, even if the system itself and its placement passed the required perc tests.

There is no dispute that in late 2000 and early 2001, the Smith Street property contained wetlands, which were not reflected in Drown's 1996 plan. Thus, Drown's rep-

resentations that the septic plan was still good and the lot was a good one were inaccurate and false in the fall of 2000. Moreover, Hebert testified that the 1996 plan contained numerous errors including inaccurate elevations. A review of the Title 5 regulations in effect in December 2005, which are attached at Appendix 1, compels the conclusion that Drown failed to include the "location of any surface waters of the Commonwealth, rivers, bordering vegetated wetlands... within which portions of the proposed system are located." 310 Code Mass. Regs. tit. 310, § 15.220.

■ Having concluded that Drown was negligent in responding to Hebert's questions about the Smith Street property, and that he may have been negligent in 1996 in failing to delineate wetlands, Hebert's claim must, nevertheless, fail. The critical issue in this case is whether Hebert justifiably relied upon Drown's 1996 plan, or on his statements made in their November 2000 conversation at the Elm Street property. The Court finds that Hebert's reliance was unjustified.

Field raised the issue of wetland when Hebert drove him by the Smith Street property, and the health agent for the Town of Dighton raised the issue in January 2001 when he went to the site to oversee percolation tests. Field's oblique warning was sufficient to put Hebert on notice that his reliance on a 1996 plan which did not contain delineation of wetlands may not be justified without further investigation, particularly when the proposed driveway to the house site was in wetlands and first thing Hebert was required to do when he began developing the site was to install a culvert "to allow the water to run through where the driveway was."

Because Drown's 1996 plan did not delineate wetlands and because wetlands were apparent at the site, the Court finds that Hebert was not justified in relying upon the Debtor's representation in the 1996 plan, and his silence about wetlands during the November 2000 conversation, that there were no wetlands. Like the knowledgeable horseman in *Field v. Mans* considering the purchase of a young horse with long teeth, Hebert was not justified in ignoring what his senses revealed, namely that there were wetlands on the property. Confronted with a plan that showed no wetlands and the only access to the house site through wetland, Hebert, with his years of experience in the construction business, was not justified in his reliance on Drown's septic plan, and the damages he sustained were not the result of Drown's negligence.

2. Comparative Negligence

■ The Court asked the parties to brief the issue of comparative negligence. Although in the case of a fraudulent misrepresentation, comparative negligence is inapplicable, *see Field v. Mans,* 516 U.S. at 72, 116 S.Ct. 437; *Flood v. Southland Corp.,* 33 Mass.App.Ct. 287, 296, 601 N.E.2d 23 (1992) ("[T]he comparative negligence statute, G.L. c. 231, § 85, does not allow for the comparison of negligent and intentional conduct."), the application of comparative negligence to negligent misrepresentations is somewhat unsettled in Massachusetts. *See Dhanda v. Tri M. Ltd.,* 24 Mass.App.Ct. 700, 703–03, 512 N.E.2d 1141 (1987). Recent cases, however, apply principles of comparative negligence, and this Court predicts the Supreme Judicial Court would apply them to the case at hand. *See Clark v. Rowe,* 428 Mass. 339, 701 N.E.2d 624 (1998); *Town of Wrentham v. Bezema,* No. 0000713, 2002 WL 2017108 (Mass.Super.2002).

In *Rowe,* a case involving attorney malpractice, the Supreme Judicial Court stated:

Comparative fault appropriately applies to a client's claim of malpractice by a

lawyer. *See Pinkham v. Burgess,* 933 F.2d 1066, 1073 (1st Cir.1991) ("[a]ll of the courts that have considered the issue have held that the defense of contributory negligence applies in legal malpractice actions, despite the fiduciary nature of the attorney-client relationship"). The limitations on recovery stated in G.L. c. 231, § 85, appropriately guide us to adopt them as a common law rule. *Rowe,* 428 Mass. at 345, 701 N.E.2d 624.

In *Bezema,* the Superior Court extend the principle of comparative negligence to a situation where the defendant purchased a piece of property smaller than what he bargained for and was required to demolish a structure he built on the property because it encroached on an adjacent property. The court determined that it would apply principles of comparative negligence in sorting through the various claims.

■ Assuming, *arguendo,* that Hebert was justified in relying upon Drown's four year old septic plan, Hebert's negligence was greater than the Debtor's with respect to his development of Lot 1. He was aware of the risks attendant to building in or near wetlands and chose to proceed at his own risk. Hebert's purchase of the Smith Street property was contingent on obtaining all requisite permits for a house and septic system. As of the date of the closing, Hebert, a former building inspector with first hand knowledge of the perils of construction in wetland areas, did not have requisite approvals from the Town of Dighton for the construction of the house he planned to build, including the septic system. Hebert chose to close without an updated septic system and wetlands analysis, relying instead upon a four year old plan and a brief conversation with Drown. Moreover, he began construction without the requisite permits proceeding "at his own risk" based on the verbal assurance of the building inspector for the Town of Dighton that the permits would issue.

Had Hebert awaited Town approval prior to closing the sale, as the purchase and sale agreement allowed by virtue of the contingency, he would not have sustained any damages. Had he extended the purchase and sale agreement, which was his right under the agreement, upon the Town's disapproval of his permits due to the extent of the wetlands, he would have been able to terminate his obligations under the agreement and get his deposit back. Instead, Hebert precipitously and prematurely closed the sale without obtaining updated plans or Town approvals. His damages were caused more by his own negligence in buying and proceeding to develop a property without a complete and updated wetlands analysis and Town permits, not Drown's negligent misrepresentation.

## V. CONCLUSION

For the reasons set forth above, the Court shall enter an order sustaining the Debtor's Objection to Hebert's proof of claim.

### APPENDIX 1

### CODE OF MASSACHUSETTS REGULATIONS

### TITLE 310: DEPARTMENT OF ENVIRONMENTAL PROTECTION

CHAPTER 15.000: THE STATE ENVIRONMENTAL CODE, TITLE 5: STANDARD REQUIREMENTS FOR THE SITING, CONSTRUCTION, INSPECTION, UPGRADE AND EXPANSION OF ON–SITE SEWAGE TREATMENT AND DISPOSAL SYSTEMS AND FOR THE TRANSPORT AND DISPOSAL OF SEPTAGE

The plans and specifications for every on-site system shall be prepared as follows:

(1) Every system shall be designed by a Massachusetts Registered Professional Engineer or a Massachusetts Registered Sanitarian provided that such Sanitarian shall not design a system designed to discharge more than 2,000 gallons per day pursuant to 310 CMR 15.203. Any other agent of the owner may prepare plans for the repair of a system designed to discharge not more than 2,000 gallons per day pursuant to 310 CMR 15.203 provided they are reviewed by a Massachusetts Registered Sanitarian and approved by the approving authority;

(2) Every plan submitted for approval must be dated and bear the stamp and signature of the designer;

(3) Every plan for a new system or plan for the upgrade or expansion of an existing system which requires a variance to a property line setback distance, must also reference a plan which bears the stamp and signature of a Massachusetts Licensed Land Surveyor in accordance with M.G.L. c. 112, § 81D;

(4) Every plan for a system shall be of suitable scale (one inch = 40 feet or fewer for plot plans and one inch = 20 feet or fewer for details of system components) and shall include depiction of:

(a) the legal boundaries of the facility to be served;

(b) the holder and location of any easements appurtenant to or which could impact the system;

(c) the location of the all dwelling(s) or building(s) existing and proposed on the facility and identification of those to be served by the system;

(d) the location of existing or proposed impervious areas, including driveways and parking areas;

(e) location and dimensions of the system (including reserve area);

(f) system design calculations, including design daily sewage flow, septic tank capacity (required and provided); soil absorption system capacity (required and provided); and whether system is designed for garbage grinder;

(g) North arrow and existing and proposed contours;

(h) location and log of deep observation hole tests including the date of test, existing grade elevations marked on each test, and the names of the representative of the approving authority and soil evaluator;

(i) location and results of percolation tests including the date of test and the names of the representative of the approving authority and soil evaluator;

(j) name and certification number of the Soil Evaluator of record;

(k) location of every water supply, public and private,

1. within 400 feet of the proposed system location in the case of surface water supplies and gravel packed public water supply wells,

2. within 250 feet of the proposed system location in the case of tubular public water supply wells, and

3. within 150 feet of the proposed system location in the case of private water supply wells;

(l) location of any surface waters of the Commonwealth, rivers, bordering vegetated wetlands, salt marshes, inland or coastal banks, regulatory floodway, velocity zone, surface water supplies, tributaries to surface water supplies, certified vernal pools, private water supplies or suction lines, gravel packed or tubular public water supply

wells, subsurface drains, leaching catch basins, or dry wells; and the location of any nitrogen sensitive area identified in 310 CMR 15.215 within which portions of the proposed system are located.

(m) location of water lines and other subsurface utilities on the facility;

(n) observed and adjusted groundwater elevation in the vicinity of the system;

(o) a complete profile of the system;

(p) a note on the plan listing all variances to the provisions of 310 CMR 15.000 sought in conjunction with the plan;

(q) the location and elevation of one benchmark within 50 to 75 feet of the facility which is not subject to dislocation or loss during construction on the facility;

(r) when dosing is proposed, complete design and specification of the dosing system proposed including but not limited to dosing chamber capacity (required and provided), pump curves and specifications, number of dosing cycles and depth per cycle;

(s) when a Recirculating Sand Filter or equivalent alternative technology is required or proposed, a complete plan and specification for the system, including a hydraulic profile;

(t) a locus plan to show the location of the facility including the nearest existing street;

(u) the street number and lot number, if any, of the facility; and

(v) the materials of construction and the specifications of the system.

Mass. Regs.Code tit. 310, § 15.220